**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA

No. 4:21-CR-00234

- v -

(Chief Judge Brann)

ABDULRAHMAN EL BAHNASAWY,

Defendant.

[FILED ELECTRONICALLY]

**MOTION FOR PERMISSION FOR THE DEFENDANT (1) TO PLEAD *NOLO CONTENDERE,* PURSUANT TO FED. R. CR. P. 11(a)(3), TO COUNTS ONE AND TWO OF THE INDICTMENT; AND (2) FOR THE DEFENDANT TO ENTER SUCH PLEA REMOTELY**

For the reasons stated in the accompanying declaration of defense counsel of record Andrew J. Frisch, defendant Abdulrahman El Bahnasawy moves for permission for him (1) to plead *nolo contendere*, pursuant to Rule 11(a)(3) of the Federal Rules of Criminal Procedure, to counts one and two of the indictment (each charging assault of a federal officer in violation of 18 U.S.C. § 111(a)(1)); and (2) to enter such plea remotely from the facility of the Bureau of Prisons in

Colorado where he is lodged. The government has advised defense counsel that it will advise the Court of its position on this motion in its papers in response.

Dated: October 17, 2022

Respectfully submitted,

*/s/ Andrew J. Frisch*
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*
Bar No. NY1970243

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA

- v -

ABDULRAHMAN EL BAHNASAWY,

Defendant.

No. 4:21-CR-00234

(Chief Judge Brann)

[FILED ELECTRONICALLY]

**DECLARATION IN SUPPORT OF MOTION**

Andrew J. Frisch declares as follows pursuant to 28 U.S.C. §1746:

Introduction

1. I respectfully submit this application on behalf of defendant Abdulrahman El Bahnasawy for permission for him (1) to plead *nolo contendere*, pursuant to Rule 11(a)(3) of the Federal Rules of Criminal Procedure, to counts one and two of the indictment (each charging assault on a federal officer in violation of 18 U.S.C. § 111(a)(1); and (2) to enter such plea remotely from the facility of the Bureau of Prisons ("BOP") in Colorado where he is lodged. If these motions are granted, I respectfully request that I be permitted to be with Mr. Bahnasawy in Colorado when he enters his plea. Should the Court wish oral argument on this motion or a conference in advance of ruling, I stand ready to appear in Williamsport and waive Mr. Bahnasawy's appearance for the argument.

2. As this Declaration explains in greater detail, I propose that Mr. Bahnasawy be permitted to plead *nolo contendere* to counts one and two of the indictment for the following reasons. Mr. Bahnasawy has indisputably suffered from mental illness. *See, e.g., United States v. Bahnasawy*, 813 Fed. Appx. 721 (2d Cir. 2020) (noting sentencing judge's consideration of Mr. Bahnasawy's history of mental illness and addictions). *See, generally, United States v. Bahnasawy*, Criminal Case No. 16-376 (S.D.N.Y.) (Berman, U.S.D.J.). The conduct alleged in the indictment occurred at FCI Allenwood in its Transitional Care Unit ("TCU") to which only inmates with mental illness are designated by BOP.

3. During the course of Mr. Bahnasawy's case in New York, he was evaluated by multiple highly-respected professionals engaged by his counsel. As established by the record of the case in New York and the testimony of two of the professionals at Mr. Bahnasawy's sentencing, he was evaluated to develop evidence in mitigation, not because the court or defense counsel questioned his ability "to understand the nature and consequences of the proceedings against him or to assist properly in his defense." *See* 18 U.S.C. § 4241(a). Undersigned counsel has represented Mr. Bahnasawy since 2017 and has no doubt that he understands the nature and consequences of this proceeding and is able to assist in

his defense in this case as in New York.

4. The professionals who evaluated Mr. Bahnasawy in New York concluded in the aggregate that he suffered from one or more of bipolar disorder, substance use disorder, mild neurocognitive disorder, possibly schizophrenia, and auditory hallucinations that came to him in the form of a delusion that spoke to him. A conclusion from the evaluations in New York is that Mr. Bahnasawy functions well when adequately treated and medicated and lapses when not. While the written reports of the evaluating professionals remain under seal in the Southern District of New York, undersigned counsel's application for permission to disclose constituent medical and therapeutic findings to this Court was granted. *See United States v. Bahnasawy*, 16 CR 376 (S.D.N.Y. Docket No. 152) (Order of the Honorable Richard M. Berman, October 13, 2022).

5. Kenneth J. Weiss of the University of Pennsylvania, a clinical professor of psychiatry at the University of Pennsylvania who has practiced psychiatry for over forty years and held multiple academic positions in psychiatry (Exhibit A, Dr. Weiss's *curriculum vitae*) evaluated Mr. Bahnasawy in connection with this case and reviewed his extensive psychiatric history. Dr Weiss concluded by written report dated July 7, 2022 (Exhibit B), that the conduct alleged in the pending indictment occurred during a psychotic episode at FCI Allenwood when

Mr. Bahnasawy was not medicated. With the government's consent, Dr. Weiss's report as filed publicly herewith redacts the names of two doctors who evaluated Mr. Bahnasawy on behalf of BOP at FCI Allenwood and thereafter at USP Lewisburg. It also redacts the name of an officer identified by his initials in count one of the indictment out of respect for his privacy.

6. According to BOP, Mr. Bahnasawy's release date on his existing sentence is 2051. *See https://www.bop.gov/inmateloc/.* While I expect to advise the Court of mitigating circumstances at sentencing should the proposed plea *nolo contendere* be permitted (and should it serve to resolve the case), such a plea would subject Mr. Bahnasawy to additional imprisonment of up to forty years (twenty years on each count of assault) in addition to the thirty years that remain on his existing sentence. The nature of Mr. Bahnasawy's criminal conduct and his Canadian citizenship disqualify him for types of early release sometimes available for United States citizens. The proposed disposition will serve the public interest in Mr. Bahnasawy's accountability and provide the two affected officers and the people of the Middle District of Pennsylvania with the certainty of convictions for each of the alleged assaults. Even if the government opposes this motion and presses for a trial on all charged counts, Mr. Bahnasawy still offers to plead *nolo contendere* to counts one and two of the indictment to demonstrate accountability.

7. This Declaration is based on Dr. Weiss's report, records from BOP, the record of Mr. Bahnasawy's case in New York, and undersigned counsel's firsthand knowledge from representing him beginning in 2017.

A. Mr. Bahnasawy's Treatment for Mental Illness Beginning in Adolescence

8. Mr. Bahnasawy was born in Kuwait in 1998. He has one sibling, an older sister. Before Mr. Bahnasawy's criminal conduct in New York, his parents moved their family to and from Kuwait, Egypt, and Canada principally to secure the best possible treatment for Mr. Bahnasawy's mental illness. Mental health professionals who evaluated Mr. Bahnasawy in New York noted that his parents' well-intentioned relocations to and from Kuwait, Egypt, and Canada to find effective treatment had the unintended consequence of disrupting Mr. Bahnasawy's socialization and development. Exhibit B at 3-5.

9. A documented and defining feature of Mr. Bahnasawy's adolescent mental illness was an especially significant urge to self-medicate. He began by compulsively using marijuana, later turning to opioids, stimulants and hallucinogens. Of particular concern, he began huffing butane compulsively, apparently contributing to the onset of auditory hallucinations when he was a teenager. The hallucinations appeared in the imagined form of a named person who spoke to him. Exhibit B at 3-5.

10. Mr. Bahnasawy's first psychiatric contact was at age eleven when he had episodes of being "too happy and so powerful" and also "so depressed and felt he didn't deserve to live." He obtained marijuana from a high school student and began extensively using it. At age fifteen, he began obsessive thinking, dwelling alternately on the merits of atheism, drugs, and other topics, and ultimately appearing to be talking to or laughing with someone imaginary. He was admitted to a psychiatric hospital at age fourteen because of hallucinations. He took steps toward suicide on multiple occasions. Exhibit B at 3-5.

11. Mr. Bahnasawy was admitted to the Kuwait Psychiatric Hospital in 2014. He was diagnosed with substance use disorder and administered an anti-psychotic medication and an anti-depressant. Exhibit B at 5-6. He was also assessed and treated in 2014 at Canada's Centre for Addiction and Mental Health. His psychotic symptoms were attributed to self-medicating with controlled substances. Exhibit B at 6. He was also treated at the Alriyada Recovery Centre in Alexandria, Egypt, which reported in sum and substance as follows:

> The Alriyada Centre for Psychiatric Medicine and Addition Treatment certifies that the above mentioned person has been diagnosed as suffering from bipolar emotional disorder, fits of obsession, and fits of depression together with psychotic symptoms. The obsession fit exceeds the depression ones. Symptoms of the disease are expressed in the buying obsession, a lot of joking, chatting. During these fits he has little sleep of 3 to 4 hours. He is

> not aware of himself and does not abide by his promises and statements. He used to take medicine for the psychotic symptoms such as Depakene, Cipralex [Lexapro in U.S.], Modapex [Zoloft in U.S.], and Remeron. He was admitted to the recovery residence affiliated to the Centre on 31/10/2014 and was discharged on 09/06/2015.

Exhibit B at 6.

12. In 2016, while awaiting an appointment to begin new psychiatric treatment in Canada and without medication, Mr. Bahnasawy communicated online from his bedroom in his parents' home in suburban Toronto first with a representative of ISIS (known also as the Islamic State), and thereafter with an undercover federal agent to cause mayhem in New York City. Mr. Bahnasawy was arrested in May 2016 a few months after his eighteenth birthday when his parents, driving in their family car from their home in Canada for what they believed would be a vacation weekend, entered the parking lot of a hotel near New York City. Exhibit B at 5; *see generally United States v. Bahnasawy*, 16 CR 376 (S.D.N.Y.). Mr. Bahnasawy has been continuously in federal custody since his arrest.

13. From Mr. Bahnasawy's arrest in May 2016 until his sentencing in December 2018, he was lodged at Manhattan's Metropolitan Correctional Center ("MCC"), which BOP closed in 2021 because of notoriously bad

conditions. *See https://www.nytimes.com/2021/08/26/nyregion/MCC-epstein-jail-closed.html.* During the years that Mr. Bahnasawy was lodged at the MCC, he had access to contraband substances such as suboxone and K2, a synthetic sprayed with psychoactive chemicals. *See www.dea.gov/factsheets/spice-k2-synthetic-marijuana. See generally United States v. Bahnasawy*, 16 CR 376 (S.D.N.Y.). Even after Mr. Bahnasawy's transfer to FCI Allenwood's TCU in November 2020 and release a few weeks later from COVID quarantine to the unit's population, he obtained and used another inmate's prescribed klonopin on multiple occasions, including on December 6 2020, the day before the conduct alleged in the indictment.

14. BOP's records about Mr. Bahnasawy's psychiatric condition beginning in 2016 consist of 400 pages of detailing diagnoses, medications, and other clinical data. Dr. Weiss in his report noted highlights from BOP's records "to illustrate the nature, genuineness, persistence, and severity of Mr. Bahnasawy's psychiatric condition." Exhibit B at 6. For example, upon Mr. Bahnasawy's remand to the MCC in 2016, BOP noted Mr. Bahnasawy's hallucinations, anxiety attacks, and suicidal ideation, but Dr. Weiss concluded that "it does not appear that the severity of his underlying condition was appreciated." Exhibit B at 6.

15. During the two years from Mr. Bahnasawy's sentencing in New York in December 2018 until the alleged conduct in this case in December 2020, he was moved by BOP at least eight times, replicating the disruption of routine that mental health professionals in New York had noted as impairing his socialization and development. During those two years, he was lodged at various times at USP Atlanta, USP Leavenworth in Kansas, USP Sandy Hook in Kentucky, and FCI Gilmer in West Virginia, with multiple stops at FTC Oklahoma City while in transit. Mr. Bahnasawy self-medicated with contraband substances acquired from within some of these facilities. He was typically thereafter punished by BOP for doing so with placement in segregated housing units (the "SHU") and loss of privileges, including communication with his parents, replicating the deleterious social isolation of his adolescence. *See, e.g., "Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness,"* Office of the Inspector General, U.S. Department of Justice, July 2017. Mr. Bahnasawy was transferred to FCI Allenwood's TCU in early November 2020 and kept in COVID quarantine for about three weeks before released to the unit's population, within about two weeks of the conduct alleged in the indictment.

16. After Mr. Bahnasawy's sentencing in New York 2018, and as

late as the weeks before the alleged conduct of December 7, 2020, Mr. Bahnasawy's parents attempted to focus BOP, including psychiatric staff at FCI Allenwood, on Mr. Bahnasawy's psychiatric history, specifically advising FCI Allenwood of medications that he could tolerate without side effects, and specifically warning BOP of the potential for psychotic episodes absent proper medication and treatment. The parents' emails to BOP attached some of the above-described medical reports submitted in the Southern District of New York, most of which are contained in or expressly referred to in Mr. Bahnasawy's BOP medical file. The following are examples of the parents' emails to BOP:

> • April 2, 2019, email to USP Leavenworth (Exhibit C), attaching medical reports, advising that "Abdulrahman suffers from bipolar disorder since he was 14 years old . . . . Abdulrahman is a drug addict he tried all types of drugs so he should be away from the drugs and be under supervision. The best medication for Abdulrahman and make a very good results is: 1) Ariprex 10 mg once a day and 2) Tegretol 400 mg once a day;
>
> • August 6, 2019, email to BOP (Exhibit D), attaching medical reports, advising BOP that Mr. Bahnasawy was diagnosed with mental illness beginning in childhood and specifically advising of his suicidal ideation and attempts;
>
> • November 26, 2019, email to FCI Gilmer (Exhibit E), advising that "medication is a must for him and not optional to make him stable," and that his prolonged placement in the SHU will "harm his mental function;"
>
> • April 23, 2020, email and letter to USP Big Sandy as well as Traci Amundson, M.D., BOP's Chief Psychologist (Exhibit F), specifically alerting BOP to Mr. Bahnasawy's auditory hallucinations and potential

consequences if BOP failed properly to medicate and treat him:

> *[A]s parents of Abdulrahman El Bahnasawy, we want to address our son's mistreatment directly. With tremendous respect for your management at USP Big Sandy, we would like to courteously address a complaint about our son's situation in prison.*
>
> *Abdulrahman has various mental health problems that are well documented and we are deeply concerned about his prison condition. Since he arrived at USP Big Sandy, he has been detained in the Special Housing Unit (SHU). We have seen from his time in MCC and FSI, as consistent with studies, that his detention in SHU causes anxiety, panic attacks, depression, anger, hostility, poor memory, disorientation, and self-harm. Furthermore, because he is not on his proper medication, the effects are severely worsened (details are available in his file).*
>
> *One of these effects is forgetting the rules and consequences, which may lead his decision-making to be in violation of prison regulations. Hence, he needs support to keep on the right path. We hope that you understand that medical treatment and proper psychology care is more effective and helps to control Abdulrahman mental health issues than placement in SHU and punishments.*
>
> *. . . .*
>
> *Our son is facing anxiety and depression because of these abhorrent conditions as well as the recent blockade of visitation due to COVID-19. Abdulrahman's medical team can explain to you how our visitation is essential for his well-being and mental stability.*
> *As you know from his file:*
>
> *1. Abdulrahman suffers from mental health bipolar disorder that causes him shifts in mood or behaviors, depression, psychotic symptoms including hallucinations and hearing of voices, and thoughts of suicide.*

> *2. Abdulrahman's bipolar disorder symptoms have always been very frightening for him.*
>
> *3. Abdulrahman is not receiving the proper medical treatment needed for his diagnosis.*
>
> *4. The prolonged solitary confinement of someone with bipolar disorder like Abdulrahman, as well as sleep deprivation, intensifies the anxiety, panic attacks, depression, anger and hostility, and self-harm.*

• November 3, 2020, email to FCI Allenwood (Exhibit G), urging that medical reports attached to the email be provided to the prison's "mental illness department," and specifically advising FCI Allenwood of the need for certain medications [which are used to treat psychosis, bipolar disorder, and/or schizophrenia]:

> *The best medications which give a very good results for Abdulrahman are:*
>
> *1) Aripiprazole 10 mg per day*
> *2) Tegretol 400 mg per day*
>
> *other medications which are not good and have bad side effect at Abdulrahman and bring to him suicide thoughts and irregular heartbeats are Haldol[] and Geodon. The medication is very important for Abdulrahman. Can you please take care of his medications . . .*

• November 10, 2020, two emails to FCI Allenwood (Exhibit H), again identifying medications needed by Mr. Bahnasawy because "otherwise he won't know the [consequences] behind his behaviour and may cause a problem for you and for himself:"

> *My sick son has mental illness - bipolar disorder since his childhood. He has a mood swing between depression and the mania which cause him to take drugs to be happy. The best medications which give him*

> *a very good results for Abdulrahman are:*
>
> *1) Aripiprazole 10 mg per day*
> *2) Tegretol 400 mg per day*
>
> *. . . . The medication is very important for Abdulrahman otherwise he won't know the [consequences] behind his behaviour and may cause a problem for you and for himself. Can you please take care of his medications at [] Allenwood. The Psychiatrist at Allenwood are most welcome to call or e-mail me anytime if he wants more details.*

• December 1, 2020, email to FCI Allenwood (Exhibit I), advising that "Abdulrahman has a bipolar disorder since his childhood and the medications gave with his a very good results [sic]. So please give him the bipolar medications we prefer the injection otherwise he may cause a problems for you due to his mood swing."

In addition, in the weeks just before the alleged conduct at FCI Allenwood on December 7, 2020, Mr. Bahnasawy's parents requested that the Canadian government intercede and advise FCI Allenwood of Mr. Bahnasawy's urgent need for proper treatment and medication.

17. The above-quoted emails from Mr. Bahnasawy's parents are proffered in support of this motion to corroborate Dr. Weiss's opinion that Mr. Bahnasawy suffered a psychotic episode. Whatever BOP's civil liability may be to the affected officers, the medical records establish that Mr. Bahnasawy functions well when medicated, but, precisely as predicted by Mr. Bahnasawy's parents, "otherwise he won't know the [consequences] behind his behaviour and

may cause a problem for you and for himself."

B. Dr. Weiss's Conclusion that Mr. Bahnasawy's Conduct Occurred During a Psychotic Episode

18. Based on interviews with Mr. Bahnasawy and his parents and review of records discussed herein, Dr. Weiss concluded that Mr. Bahnasawy "was in the midst of a psychotic episode" when he engaged in the charged conduct:

> [T]he condition included an elaborate delusion that he was controlled by a demon, that he had hallucinations affirming the delusion, and that he experienced intense anxiety and internal pressure to fulfill the perceived mandate. The mandate, in my opinion, while containing external features of political motivation, was mainly a manifestation of mental illness. Irrespective of whether Mr. Bahnasawy chooses to place his mental state at issue before the court, it is my opinion that the actions on December 7, 2020 were animated by a mental disease.

Exhibit B at 8.

19. Mr. Bahnasawy told Dr. Weiss that he began hearing the auditory hallucination when he was about fifteen. While Mr. Bahnasawy explained that he sometimes believed that the voice was associated with someone real, medication helps him know that the voice is a hallucination. He has heard the voice through television, radio, and songs. For example, there would be a news story about a car accident, and Mr. Bahnasawy would conclude that an accident would befall his family. According to Mr. Bahnasawy, the voice threatens him if he fails to follow its directions even if doing so carries

consequences, such as the incident in FCI Allenwood's TCU. Exhibit B at 2.

20. Mr. Bahnasawy said that he thought the hallucination had died in a car accident, but it reappeared after Mr. Bahnasawy arrived at Allenwood. The hallucination told Mr. Bahnasawy that he was a failure and threatened him if he did not follow directions. Mr. Bahnasawy was focused at the time on preventing harm to himself from the hallucination's perceived threat. He believed that the perceived consequences to him from the hallucination were greater than the real consequences. Mr. Bahnasawy believed that he or his family would be harmed if he did not create and use a weapon as the hallucination directed and otherwise act as directed. Exhibit B at 2.

21. At the time of the incident, Mr. Bahnasawy was not medicated. It appears that BOP's first psychiatric evaluation of Mr. Bahnasawy after his arrival at FCI Allenwood and release from COVID quarantine was conducted by a physician's assistant on November 25, 2020. The assistant's notes confirm that Mr. Bahnasawy was not medicated:

> The inmate has a [history] of multiple diagnoses including Bipolar D[isorder], Unspecified Schizophrenia, Major Depression, and polysubstance abuse. The inmate is currently being treated for mixed personality disorder. The inmate is not currently on any meds and is doing well.

Exhibit B at 7. Dr. Weiss concluded from the following notes in the BOP records

that,"the mental health staff was content to accept Mr. Bahnasawy's denial of symptoms and to wait for the necessity for treatment to arise:"

> If he should develop psychotic [symptoms], or appear to have a cyclical mood disorder, then the med question can be addressed. As far as depression and anxiety, I believe that the best course for him is to engage with treatment and to have positive peers . . . . It is likely that he will be on this unit for at least a few years, so there is time for the diagnoses and treatments to evolve . . . . It will be important for him to not engage in rule-breaking or dangerous behavior. He has multiple disciplinary infractions--and criminality may eventually overshadow any mental health concerns.

Exhibit B at 7-8.

22. BOP records show that, in March 2021, a doctor engaged by BOP seemed to blame Mr. Bahnasawy for poor response to medication:

> Since 2016, Inmate El Bahnasawy has been prescribed multiple psychiatric regimens to include: olanzapine, Risperdal, Geodon, trazodone, and Haldol. Most of these medications were stopped either due to poor response, poor compliance, or diversion. His last regimen consisted of Haldol, which he refused. He has not been on any psychiatric medication for the past year. He has a significant history of drug use/abuse. It is highly likely that this is the source for his reported auditory hallucinations. If this is the case, it would explain the poor response to medications. Furthermore, it appears that he has strong evidence for goal-oriented, planned behavior. This is not typical of those individuals suffering from a psychotic disorder. With this in mind, I am not recommending any psychiatric medication. Since his arrival in December, he has presented with a largely calm demeanor and mostly appropriate interactions.

Exhibit B at 7. In Dr. Weiss's opinion:

> Illnesses such as bipolar disorder and schizophrenia, after becoming established, do not usually remit on their own. A person with Mr.

> Bahnasawy's history should have been considered an ideal candidate for long-acting injections, as Dr. Mariani suggested [in his report submitted in New York], or at least a mood stabilizing medication to prevent bipolar mood swings.

Exhibit B at 7-8 ("the diagnosis of bipolar disorder and the known historical severity of his condition would have mandated preventive care (mood-stabilizing, antidepressant, and antipsychotic medication or combination)").

23. Regarding medications, Mr. Bahnasawy told Dr. Weiss that he was last on regular medications during his incarceration at the MCC. He did not always take medication because he believed they caused panic attacks. Now medicated, Mr. Bahnasawy said that he no longer has mood swings and is in a better position to resist the hallucination, so that the charged conduct "will not happen again." Exhibit B at 3.

24. Despite the ostensible ideological motivation for Mr Bahnasawy's conduct, Dr. Weiss's conclusions and Mr. Bahnasawy's history of mental illness help show that there is no real connection between Mr. Bahnasawy's hallucinations and any truly held belief in ideology. Mr. Bahnasawy reported to Dr. Weiss that he was manic and not sleeping (and not properly medicated) at the time of the conduct that led to his prosecution in New York. As Dr. Weiss reports, Mr. Bahnasawy "has no active political ideology:"

> [Mr. Bahnasawy] said that the events at Allenwood were due to the hallucination, and that he did not perceive that the idea came from within himself. The hallucination drove his conduct and what he wrote down at the time and said about it. Now that he is on medication, he knows that he does not believe what he wrote and said at the time. Mr. Bahnasawy said that the urge to harm himself or others is no longer present.

Exhibit B at 3. Two of the mental health professionals who evaluated Mr. Bahnasawy in New York testified at his sentencing to their optimism for his future if he received proper treatment and was properly medicated. Their testimony echoed medical opinions during Mr. Bahnasawy's adolescence and as an adult before his sentencing in New York that he functions well when properly treated and medicated.

### C. Mr. Bahnasawy Should be Permitted to Plead *Nolo Contendere* to Counts One and Two of the Indictment

25. A plea *nolo contendere* "is a statement of unwillingness to contest the government's charges and an acceptance of the punishment that would be meted out to a guilty person." *Sharif v. Picone*, 740 F.3d 263, 267 (3d Cir. 2014) (citation omitted); *United States v. Adedoyin*, 369 F.3d 337, 343-44 (3d Cir. 2004). "A judgment entered on a plea of *nolo contendere* adjudicates guilt with the same finality and force as a judgment entered pursuant to a guilty plea or conviction following trial.") (citation omitted); *United States v. McGill*, 128 F. Supp. 3d 863, 868 (E.D. Pa. 2015) (a plea *nolo contendere* is "tantamount to an

admission of guilt, such that all remains for the court to do after accepting the plea is enter judgment and pass sentence.") (citation and internal quotation marks omitted).

26. "Before accepting a plea of *nolo contendere*, the court must consider the parties' views and the public interest in the effective administration of justice." Fed. R. Crim. P. Rule 11(a)(3). "[T]he balancing of interests is left to the trial judge . . . [so long as the judge] "take[s] into account the larger public interest in the effective administration of justice." Fed. R. Crim P. 11, Advisory Comm. Note to 1974 Amend.

27. A plea *nolo contendere* will serve the interests of the two affected officers and the community by assuring convictions that embrace the alleged conduct against the officers while eliminating the risks of trial and the attendant devotion of resources. The two counts to which Mr. Bahnasawy proposes to plead *nolo contendere*, as further detailed by the government's discovery, allege that (a) Mr. Bahnasawy, an inmate at FCI Allenwood's TCU, used a sharpened metal weapon to assault an officer immediately after his cell door was opened early on December 7, 2020, causing the officer to lose an eye; and (b) a second officer was injured in an ensuing struggle. Each of the two counts will subject Mr. Bahnasawy to a potential term of imprisonment of twenty

years. Meanwhile, Mr, Bahnasawy is not eligible for release on his sentence from his case in the Southern District of New York until 2051.

28. BOP has itself administratively responded to the conduct. Mr. Bahnasawy was moved immediately after the alleged conduct from FCI Allenwood to USP Lewisburg and is now lodged at USP Florence ADMAX in Colorado. The certainty of consequences to Mr. Bahnasawy of a plea *nolo contendere* outweighs the risks and associated devotion of resources attendant a trial.

29. Justice is best served under the atypical circumstances of this case for the proposed plea to resolve the case. Even if the government insists on a trial in this case, Mr. Bahnasawy wishes to plead *nolo contendere* to counts one and two of the indictment to demonstrate accountability.

30. If this application is granted, Mr. Bahnasawy will waive his personal appearance for entry of the plea and sentencing. My preference would be to attend any such proceedings by Mr. Bahnasawy's side in Colorado in the event he needs my counsel, but I stand ready to attend in Williamsport. I also stand ready to appear in person for oral argument on this motion or a conference in the case and will waive Mr. Bahnasawy's appearance therefor.

For these reasons, I respectfully request that the Court permit Mr.

Bahnasawy to plead *nolo contendere*, pursuant to Rule 11(a)(3) of the Federal Rules of Criminal Procedure, to counts one and two of the indictment (each charging assault of a federal officer in violation of 18 U.S.C. § 111(a)(1)); and (2) to enter such plea remotely from the facility of the Bureau of Prisons in Colorado where he is lodged.

I declare under the penalty of perjury that the foregoing statements are true and correct.

Dated: October 17, 2022

Respectfully submitted,

*/s/ Andrew J. Frisch*
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*
Bar No. NY1970243