**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA

- v -

ABDULRAHMAN EL BAHNASAWY,

Defendant.

No. 4:21-CR-00234

(Chief Judge Brann)

[FILED ELECTRONICALLY]

**MEMORANDUM IN SUPPORT OF DISMISSAL OF COUNT NINE**

Introduction

This memorandum is respectfully submitted on behalf of Abdulrahman El Bahnasawy in the above-captioned case in support of dismissal of count nine of the indictment, charging material support of a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B. On November 4, 2025, Bahnasawy pled guilty to this case's nine-count indictment on the parties' agreement that his plea to count nine is conditional pending the Court's determination whether the government's evidence establishes a factual basis for and legal sufficiency of the government's evidence of that count. The parties agree that Exhibit A hereto is the government's statement of its evidence as read into the record at the plea hearing. The Court's options for Bahnasawy's sentencing would not be meaningfully limited if count nine were dismissed.

*1. The government's theory that Bahnasawy provided a "service" to a foreign terrorist organization by stabbing corrections officers within a prison's unit for mentally ill inmates*

The government has acknowledged that its theory of Bahnasawy's criminal liability for violating Section 2339B is that, by stabbing correction officers within a prison unit reserved for mentally ill inmates, he provided or attempted to provide a "service" to the Islamic State of Iraq and al-Sham ("ISIS"), designated by the United States Secretary of State as a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act ("INA"), *see* 18 U.S.C. § 2339B(g)(6), which has engaged in "terrorist activity." "Terrorist activity" means unlawful activity involving certain enumerated violent crimes, including hijacking or sabotaging a vehicle; seizing or detaining, and threatening to kill, injure, or continue to detain someone to compel action or abstaining from action; and assassination. *See* 8 U.S.C. § 1182(a)(3)(B)(iii).

Thus, the government proposed a jury instruction for Section 2339B in relevant part as follows:

> The first element the government must prove beyond a reasonable doubt is that the defendant knowingly provided material support or resources to a foreign terrorist organization. *Here, the government has alleged that the material support was services to ISIS.*

Dkt. 118 at 29 ("The term "material support or resources" means any property,

tangible or intangible, or *service*, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, and transportation, but does not include medicine or religious materials.") (emphasis added).

The government charged Bahnasawy with providing or attempting to provide material support to ISIS in violation of Section 2339B, but not that he *conspired* with ISIS to do so, which the statute also prohibits. See 18 U.S.C. § 2339B ("Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or *conspires* to do so . . . .") (emphasis added). As explained herein, the absence of evidence that Bahnasawy conspired with ISIS helps establish the insufficiency of evidence that he violated Section 2339B.

*2. Section 2339B's "service" requires "concerted activity," not just shared purpose*

In *Holder v. Humanitarian Project*, 561 U.S. 1, 23-24 (2010), the United States Supreme Court addressed the meaning Section 2339B's "service" in rejecting arguments of a humanitarian group that the statute is unconstitutionally vague because it bars advocacy of a designated organization's lawful objectives.

The word "service" was added to Section 2339B as part of the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), § 6603, 118 Stat. 3762-3764, which also clarified the scope of the statute's use of the term "personnel" by adding 2339(b)(h):

> No person may be prosecuted under [§ 2339B] in connection with the term 'personnel' unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. *Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.*

*Holder*, 561 U.S. at 12-13 (discussing and quoting § 2339B(h)) (emphasis added); *id.* at 23 ("The statute makes clear that "personnel" does not cover independent advocacy.").

The Supreme Court ruled that Section 2339B's "service" also refers to concerted, not independent activity. As the Court explained,

> [I]f independent activity in support of a terrorist group could be characterized as a "service," the statute's specific exclusion of independent activity in the definition of "personnel" would not make sense. Congress would not have prohibited under "service" what it specifically exempted from prohibition under "personnel." The other types of material support listed in the statute, including "lodging," "weapons," "explosives," and "transportation," § 2339A(b)(1), are not forms of support that could be provided independently of a foreign terrorist organization. We interpret "service" along the same lines . . . .

*Holder*, 561 U.S. at 23-24. Thus, as the Court explained in rejecting the constitutional challenge to Section 2339B, "service" does not embrace *independent* advocacy of a designated organization's lawful objectives because "a person of ordinary intelligence would understand the term [prohibited] "service" to cover advocacy performed in coordination with, or at the direction of, a foreign terrorist organization." *Id.* at 24.

The government's use of Section 2339B's "service" here is thus flawed in at least three ways. *First*, the government's reasons for charging Bahnasawy with Section 2339B are rooted in its institutional imperative to show results in combating terrorism, not because the statute truly applies or matters in punishing Bahnasawy for stabbing two corrections officers.[1] It is difficult to hypothesize a lone actor's independent conduct that would advance the agenda of a foreign terrorist organization that would not otherwise be criminal, *see* 8 U.S.C. § 1182(a)(3)(B)(iii) (definition of terrorist activity quoted above), but Mr. Bahnasawy's is plainly not such a case.

*Second*, the government's interpretation of "service" impermissibly

---

[1] Undersigned counsel is aware from this case and others that the government as a matter of uniform (or virtually uniform) policy does not relent on charges of material support to a terrorist organization but requires guilty pleas to them or takes the charges to trial.

end-runs the statute's outer limit prohibiting conspiracies to provide material support, which requires more than alleged association and shared purpose. Earlier this year, the Second Circuit reversed a conviction of conspiracy to injure the right to vote in violation of 18 U.S.C. § 241, finding insufficient evidence of conspiracy where the defendant re-tweeted three memes before Election Day in 2016 suggesting that Hillary Clinton's supporters could vote for her by text message. *See United States v. Mackey*, 143 F.4th 129 (2d Cir. 2025).[2] The Circuit held that, even assuming that Mackey re-tweeted the memes with intent to fool voters, the government's theory that he therefore conspired to do so because he acted "in concert" and with "the shared purpose" of like-minded others in group chats, *see id.* at 143, "plainly extend[ed] the concept of a conspiratorial agreement past its breaking point." *Id.* at 144; *see* 145 (using the terms "conspiracy" and "[c]oncerted action" interchangeably).

*Mackey* helps establish count nine's insufficiency. Like Section 2339B, Section 241 was enacted to address conduct unequivocally worthy of criminal penalty. Its predecessor was enacted as part of the Enforcement Act of 1870 to address the Ku Klux Klan's violence against and intimidation of African

[2] Undersigned counsel represented Mackey at trial in the Eastern District of New York. *See United States v. Mackey*, 1:21-cr-00080-AMD-1 (E.D.N.Y.).

Americans. *See United States v. Cruikshank*, 92 U.S. 542, 544 (1875); *Ex parte Yarbrough*, 110 U.S. 651 (1884) (prosecution of Klansman for violence and intimidation); *United States v. Price*, 383 U.S. 787, 800 (1966) ("the source of this section in the doings of the Ku Klux Klan and the like is obvious, and acts of violence obviously were in the mind of Congress.") (quoting *United States v. Mosley*, 238 U.S. 383, 387 (1915)); *see also* Michael T. Morley, *The Enforcement Act of 1870, Federal Jurisdiction over Election Contests, and the Political Question Doctrine*, 72 Fla. L. Rev. 1153, 1159-1161 (2020).

But Congress reserved criminal prosecution under Section 241 for *conspiracies* to violate constitutional rights, not independent actors who ascribed to and wished to further the Klan's agenda (and whose violent or harassing conduct may already have fallen within one or more other federal or state criminal statutes). A separate statute, Section 245(b)(1)(A), authorizes prosecution of a lone actor to use force or the threat of force to interfere with the right to vote. *See, e.g., United States v. Bathgate*, 246 U.S. 220, 226 (1918) (Congress did not intend § 241 to reach everything "supposed[ly] injurious[] to … [the] freedom, honesty, or integrity of an election.").

The Second Circuit's discussion of Section 241 in *Mackey* applies equally to Section 2339B's "service:"

> Congress expressly limited Section 241's reach to conspiracies. There are several reasons why Congress may have done so - - for example, that "[c]oncerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality," or that "[g]roup association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish." *Cf. Callanan v. United States*, 364 U.S. 587, 593, 81 S. Ct. 321, 5 L. Ed. 2d 312 (1961). *But the critical point is that Congress made this choice - - one it has declined to deviate from in the more than 150 years since Section 241's enactment. See United States v. Price*, 383 U.S. 787, 801-03, 86 S. Ct. 1152, 16 L. Ed. 2d 267 (1966).

*Mackey*, 13 F.4th at 145 (emphasis added).

Here, the government purports to see a distinction between the crime of conspiracy, which Bahnasawy did not commit when he acted on his own to stab corrections officers, and Section 2339B's "service," which requires concerted action. But there is no true distinction, as *Holder* teaches, and as *Mackey* illustrates. Consider *Mackey's* facts, which established association and shared purpose, but not concerted action. Beginning before the Presidential Election in 2106, Mackey tweeted as "Ricky Vaughn," a fictional baseball player portrayed by actor Charlie Sheen in the movie "Major League." Vaughn was known as the "Wild Thing" based on his inability to throw strikes. Mackey's avatar on Twitter was a photo of Sheen wearing a "Make America Great Again" baseball cap. Surprisingly to Mackey, a soft-spoken native of Vermont who had moved to New

York to work in finance, his Ricky Vaughn became as influential in the Twittersphere as Jimmy Fallon, Senator Elizabeth Warren, and Cher. *See Mackey*, 143 F.4th at 132-38; Second Circuit Case No. 23-7577, Dkt. 84.1 ("Gov't Brief on Appeal") at 17-30; Dkt. 44.1 ("Mackey's Brief on Appeal") at 63-67; Dkt. 124 (Trial Transcript of March 21, 2023) at 263 (admission of GX 1001, study by the Massachusetts Institute of Technology ranking influencers on Twitter).

Compare the government's evidence of Bahnasawy's pronouncement that his stabbing of the corrections officers was an attack for and his pledged allegiance to ISIS with the government's evidence of Mackey's avowed allegiance and active assistance to anti-Hillary participants in group chats who considered him a leader: (1) Mackey re-tweeted three "vote-by-text" memes similar to those created in and disseminated in chats in which he had participated; (2) he was intensely partisan and disparaged demographic groups of voters believed to favor Secretary Clinton; (3) he often boasted about his online following and frequently coached his followers on how to frame or boost their tweets, focusing on "coordinated messaging;" and (4) Mackey had a purported "silent [online] agreement" with strangers in group chats to trick voters who supported Clinton,

according to a purported online conspirator who testified at trial.[3] *See Mackey*, 143 F.4th at 132-38; Gov't Brief on Appeal at 17-30; Mackey's Brief on Appeal at 63-67.

But the evidence of conspiracy - - *concerted action* as opposed to shared purpose - - was insufficient. The Second Circuit's rebuke of the government in *Mackey* applies here: the government "cannot skirt this obligation [to prove truly concerted activity] by framing the purpose at a higher level of generality." *See Mackey*, 143 F.4th at 144. Otherwise, the government could sidestep the required elements of concerted action whenever it deemed it convenient, creating incongruous results. As one example, the government could charge conspiracy against the principals of any group, terrorist organization or otherwise, whenever a lone actor purports to answer a group's call to action, *see*

---

[3] Q: [D]id you have an agreement with others to post tweets that would tell people they could vote in an invalid way?

A: [S]o I mean the purpose of War Room (group chat) was to craft memes and tweets and strategies and so, in this case, yes, it's the same type of thing. It's the exact same thing.
. . . .

Q: [W]as this an expressly stated agreement?

A: No. It was kind of like a silent agreement. I mean, the purpose of -- that room contained only people that were considered influential within our circle that. It wasn't really random people that we just add.

*Mackey*, No. 1:23-cr-00080-AMD-1, Dkt. 125 (Trial Transcript of March 22, 2023) at 510.

*Pinkerton v. United States*, 328 U.S. 640 (1946); *United States v. Whitted*, 734 F. App'x 90, 93 (3d Cir. 2018), absent an actual conspiracy, and even though the actor's conduct violated other statutes.

*Third*, the government's position, as in *Mackey*, stretches the concept of concerted activity beyond its breaking point. Application of Section 2339B's "service" to ISIS is *sub judice* in the Second Circuit in *United States v. Akayed Ullah*, Second Circuit Case No. 21-1058. The government in *Ullah* argued that Section 2339B applied because Ullah's independent act was committed just a week after he watched ISIS propaganda which encouraged attacks and was accompanied by his professed allegiance to ISIS. The government's evidence against Bahnasawy is more attenuated: according to the government's statement of facts (Exhibit A), he had no exposure to ISIS (or an undercover officer posing as ISIS) between his arrest in New York in May 2016 and his stabbing of the officers in December 2020 and, in fact, was in federal custody during those years and had access to ISIS propaganda. And, unlike Ullah, Bahnasawy has a long and documented history of psychoses and attendant delusions and hallucinations and was lodged in a unit reserved for mentally ill inmates. Despite *Ullah's* far more proximate facts, the panel that heard oral argument of Ullah's appeal expressed skepticism about the government's broad interpretation of Section 2339B's

"service." *See Ullah*, Second Circuit Case No. 21-1058, Recording of Oral Argument, April 27, 2022, at 14:44 to 31:37. Bahnasawy had no more of a "silent agreement" with ISIS through exposure to it and its propaganda over four years before any more than Mackey truly had a "silent agreement" with strangers in chat rooms who created the re-tweeted memes just weeks before.

The government's interest in thwarting terrorism does not justify sidestepping Congressional intent and bypassing statutory requirements just as its interest in protecting the right to vote did not justify its doomed prosecution of Mackey. The only true difference between *Mackey* and this case is that the First Amendment protects an influencer who retweets even noxious memes unless he truly conspired to commit a crime with others. *See Mackey*, 143 F.4th at 145. Here, Bahnasawy has pled guilty to two counts of attempted murder and related crimes, amply capturing his criminal conduct without need for an additional, unnecessary, and inapplicable label.

For these reasons, the Court should find that count nine has an insufficient factual basis and dismiss it.

Respectfully submitted,

*/s/ Andrew J. Frisch*
Andrew J. Frisch

November 18, 2025