**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA

- v -

ABDULRAHMAN EL BAHNASAWY,

Defendant.

No. 4:21-CR-00234

(Chief Judge Brann)

[FILED ELECTRONICALLY]

## MEMORANDUM IN AID OF SENTENCING

This memorandum is respectfully submitted on behalf of Abdulrahman El Bahnasawy in aid of his sentencing, scheduled for October 19, 2026.

*A. Objections to the Presentence Report*

The Addendum to the United States Probation Department's Presentence Report ("PSR") attaches and addresses Mr. Bahnasawy's objections to the PSR issued on February 19, 2026, made by letter dated April 3, 2026. Mr. Bahnasawy respectfully requests that the following objections be resolved by the Court.

*1. Mr. Bahnasawy's Full History and Dr. Weiss's Full Report Should be Appended to the PSR*

As explained in Mr. Bahnasawy's objections to the PSR, his lawyers, clinicians, and family have been almost literally shouting from the highest

rooftops that his mental illness requires proper medication and treatment to eliminate any risk to the safety of others and himself. Mr. Bahnasawy's parents repeatedly emailed the various facilities where he was thereafter lodged, identifying specific medications that had proven effective and expressly warning that the absence of medications could result in hallucinations and psychotic symptoms.

Less than a month before the two officers were assaulted,[1] Mr. Bahnsaway emailed the facility where they worked, FCI Allenwood, that, without proper medication, "he won't know the [consequences] behind his behavior and may cause a problem for you and for himself." Less than a week before the assaults, the family again emailed FCI Allenwood, urging that Mr. Bahnasawy be given proper medication or "he may cause a problem[] for you due to his mood swing." The various emails are recounted in the above-referenced letter of April 3, 2026, appended to the PSR's Addendum, as well as Dkt. 38 at pages 12 to 15. The parents' emails included a letter that the parents wrote to BOP's chief psychologist, advising that Mr. Bahnasawy's solitary confinement and isolation "causes [him] anxiety, panic attacks, depression, anger, hostility, poor memory,

---

[1] While the two officers are expected to speak at sentencing, we do not identify them herein in an overabundance of caution.

disorientation, and self-harm. Furthermore, because he is not on his proper medication, the effects are severely worsened (details are available in his file)." Emailed letter to BOP, April 20, 2020.

We should not elevate form over substance and risk another tragedy by failing to equip BOP with all relevant information going forward. FCI Allenwood and the preceding facilities were presumably confident that they knew how best to manage Mr. Bahnasawy's mental illness without input - - which could have changed subsequent events. Perhaps ADMAX (where Mr. Bahnasawy is now detained) is better equipped to manage Mr. Bahnasawy than FCI Allenwood, but the identity of Mr. Bahnasawy's future custodians cannot now be predicted with certainty, nor is there any genuine reason to deny all available information to current and future custodians in the overarching interest of safety.

The PSR's Addendum notes the government's objection to inclusion of Dr. Weiss's report on grounds that the government's expert, Ronald Schouten, M.D., reached a different conclusion about Mr. Bahnasawy's *mens rea*, *see* Addendum at 1, but the government's objection is a *non sequitur*. Any difference of opinion about *mens rea* between Drs. Weiss and Schouten (who acknowledges Mr. Bahnasawy's various diagnoses) does not favor withholding information from BOP. The issue at hand is not whether Dr. Schouten could have supported the

sufficiency of the government's evidence of criminal *mens rea* had this case been tried, but whether prudence favors that Mr. Bahnasawy's custodians be fully educated to eliminate any risk of harm. The answer is to arm BOP with the available information provided in Dr. Weiss's report, together with the summary of the family's communications to BOP about Mr. Bahnasawy's condition and medications (as contained in Docket 38 at 12 to 15 and in defense counsel's letter of April 3, 2026).

*2. The Court Should Consider the Overlap in Offense Characteristics*

When applying offense characteristics that may be theoretically distinct but factually overlap, and when considering the increase to a criminal history category VI based on much or all of that same conduct, courts can address the potential for double-counting by ruling that the various increases may apply as a matter of law but fashioning a sentence that endeavors to mitigate the risk. The Court should not sustain the Probation Department's position on Mr. Bahnasawy's objection to overlap, *see* Addendum at 2, but if the Court rules otherwise, it should fashion a sentence that mitigates the risk of double-counting.

*3. Three Points for Acceptance of Responsibility Should be Credited*

To use the language of the Guidelines when they were mandatory, Mr. Bahnasawy's mental illness and the circumstances of the conduct at issue are

outside the heartland of cases where the viability of a third point for acceptance of responsibility can be readily and reasonably assessed based on the timing of a guilty plea. The history and circumstances of Mr. Bahnasawy's mental illness are highly atypical and required a degree of assessment of his past and current condition and the applicability of the relevant law before a guilty plea could be entered. In deciding whether to afford a third point for acceptance of responsibility, the Court should consider that more than three years before entry of a guilty plea on November 4, 2025, *see* PSR at ¶¶ 3, 7, Mr. Bahnasawy offered to plead guilty *nolo contendere* to Counts 1 and 2 of the indictment. And while the Court ultimately rejected Mr. Bahnasawy's motion to dismiss the charge of material support under 18 U.S.C. § 2339B, the Second Circuit's ruling in *United States v. Ullah*, 173 F.4th 399 (2d Cir. 2026), helps show that Mr. Bahnasawy's challenge to that charge was not frivolous. Mr. Bahnasawy did not unduly delay entering a guilty plea, but worked through a variety of non-heartland legal and factual issues with his counsel before pleading guilty. He should be afforded three points for acceptance of responsibility.

*B. Mr. Bahnasawy's History of Severe Mental Illness is Mitigating*

Mr. Bahnasawy's history of mental illness since early adolescence is documented and indisputable. The United States Probation Department agrees

that "the defendant's long-standing history of mental illness should be considered in fashioning an appropriate sentence." PSR Addendum at 3. The United States Department of Justice itself, through its Bureau of Prisons ("BOP"), lodged Mr. Bahnasawy at FCI Allenwood's Transitional Care Unit ("TCU"), created for "mentally ill inmates who have spent extended periods of time in secure treatment programs or restrictive housing settings." *See* Federal Correctional Complex Allenwood, Pennsylvania, Doctor al Psychology Internship 2022-2023 at 6.[2]

It is not just BOP and its voluminous medical records, *see, e.g.*, Dkt. 38, that acknowledge Mr. Bahnasawy's documented history of severe mental illness. The government's expert in this case, Dr. Schouten, acknowledges Mr. Bahnasawy's "extensive history of mental health and substance use issues, dating back to adolescence," his history of auditory and visual hallucinations, and his various previous diagnoses including BOP's own independent conclusions that Mr. Bahnasawy suffers from "Unspecified Schizophrenia and Other Psychotic Disorder." *See* Report of Dr. Schouten at 3-7.

The command of Title 18, United States Code, Section 3553(a), establishes that sentencing in the United States is not a zero sum game. The law

---

[2] Available at *https://www.bop.gov/jobs/docs/alx_internship _brochure_2108.pdf*

requires consideration of "the history and characteristics of the defendant" in addition to punitive considerations arising from the crime itself. Our protocols properly permit consideration of harm to victims, the circumstances from which the harm arose, *and* the defendant's history and characteristics. The law in the United States for mentally-ill defendants may endeavor in some circumstances to equate their *statutory* criminal liability with mentally-sound others, *see, e.g.*, Dkts. 103, 104, 112, 115, 125 (the parties' respective submissions about the proper scope of evidence of *mens rea*), but the law neither requires nor favors that the reality of a particular defendant's history of mental illness be ignored, as the Probation Department here acknowledges based on Section 3553(a).

Mr. Bahnasawy himself embraces the realities of the harm caused and the circumstances. In his letter to the Court, he addresses the affected officers:

> Mr. [Redacted], I cannot imagine the pain you went through that day. I am deeply sorry for what happened and for the suffering.
>
> Ms. [Redacted], I am sorry for the pain and distress you experienced. You were always kind to me, and remembering your kindness makes me very sad about what happened.
>
> If I had been mentally well and able to think clearly, this would never have happened. I have had mental health problems for many years. I have also caused great pain to my family and the people I love. I was struggling with mental illness even in prison. I was in solitary confinement without receiving the right medication and care. The isolation left me feeling more and more distressed.

*See* Letter of Mr. Bahnasawy (Exhibit A); *see also* Letter of Mr. Bahnasawy's Parents (Exhibit B) ("We offer our deepest sympathy to Mr. [Redacted] and Ms. [Redacted]. We are profoundly sorry for the injuries, fear, and distress they experienced. When we learned of the incident, we were overwhelmed with shock and grief. For days, we struggled to sleep. We cried for the officers and for our son, and felt deep sorrow for their suffering.").

As noted earlier in this case, hostility to defenses based on mental illness is significantly grounded in after-the-fact contrivances to escape liability. *See United States v. Dodd*, 225 F.3d 340, 348 (3d Cir. 2020) (noting public outcry after John Hinckley successfully argued that mental illness caused him to attempt to assassinate President Reagan to impress actress Jodie Foster); *United States v. Pohlot*, 827 F.2d 889 (3d Cir. 1987). Here, Mr. Bahnasawy's mental illness and its attendant psychosis was not contrived after-the-fact but fully documented before the events at FCI Allenwood by multiple respected clinicians and his parents. *See* Exhibit B ("As Abdulrahman moved between prisons, we repeatedly sought to provide officials with his medical records, explain the seriousness of his illness, and identify medications that had helped him and those that had caused severe side effects. We also sent letters by mail asking that his treatment needs receive attention.").

Mr. Bahnasawy and his parents continue to be optimistic that he can manage his illness with proper treatment and medication. As Mr. Bahnasawy explains,

> All I can do now is stay committed to medication and treatment and prevent further harm. When I receive my medication, I am calmer and think clearly. Growing older over these years has also helped me understand myself better. I need medication just as someone with diabetes needs insulin. I did not fully understand that when I was younger, but I do now.
>
> I want to continue receiving medication and psychological support. I have been in prison since I was 18 and was in hospitals during my teens. I never really had the chance to live, enjoy life, or build a future. I have enrolled in university. I am trying to keep learning. I cannot change the past but can live beyond my illness.

Exhibit A.

As Mr. Bahnasawy's parents explain, their confidence in the efficacy of proper treatment and medication is shared by clinicians:

> Through living alongside Abdulrahman's struggles with mental illness and addiction, we have seen the difference effective treatment makes: he became calmer, more communicative, and better able to connect with those around him.
>
> . . . .
>
> The 2018 evaluations submitted in New York documented his serious psychiatric and cognitive difficulties while recognizing his potential to improve with treatment. Dr. Ali Khadivi found reason to believe that our son could be successfully treated. Dr. Katherine Porterfield recommended continuing psychiatric care, psychological therapy, addiction treatment, education, and family contact.

The relevance of Mr. Bahnasawy's mental illness to the underlying conduct, committed within a *de facto* psych ward, is beyond reasonable dispute and is a mitigating factor properly considered and afforded significant weight.

*C. Restitution Should Be Waived*

The Probation Department's initial PSR issued on February 19, 2026, to which Mr. Bahnasawy's counsel made objections by letter dated April 3, 2026, reported that no restitution had been requested. *See* PSR at ¶ 98. With the above-noted recent Addendum to the PSR, the Probation Department issued a revised PSR, including an affected officer's "victim impact statement," including his request for restitution of $3 million, but not including his supporting records. While the indigence and mental illness of a defendant like Mr. Bahnasawy may not obviate the requirement of restitution, *see United States v. Snyder*, 601 F. App'x 67, 70 (3d Cir. 2015), and might justify nominal and periodic payments from prison wages, *see, e.g., United States v. Marchese*, 87 F. App'x 276 (3d Cir. 2004); *United States v. Ware*, No. 11-224, 2022 U.S. Dist. LEXIS 233642 (D.N.J. Dec. 30, 2022); *Motolo v. Baltazar*, No. 1:15-CV-00586, 2015 U.S. Dist. LEXIS 136152 (M.D. Pa. Sep. 15, 2015), the requirements of the Mandatory Victims Restitution Act (the "Act") have not been fulfilled, and restitution should be waived or otherwise not imposed.

A request for restitution should be in the form of an affidavit, not an unsworn statement, and should disclose a proper basis sufficient for the Court and the parties to assess the amount requested. *See United States v. Piper*, 283 F. App'x 934, 936 (3d Cir. 2008) (the district court provided the defense with an opportunity to challenge the victim's claimed restitution); *United States v. Dagostino*, 520 F. App'x 90 (3d Cir. 2013) ("We share the District Court's understandable and, in fact, quite natural inclination to provide some compensation for the harm sustained by [the victim]. Unfortunately, however, the Government's failure to submit timely some evidence by which to measure [the victim's] financial loss precludes us from affirming the District Court's modest restitution order."); *United States v. Lopez*, 503 F. App'x 147, 150 (3d Cir. 2012) (Section 3664(d)(2)(B) of the Act requires where practicable "a complete accounting of the losses to each victim" in the form of an affidavit).

Restitution here is not as readily calculable as for an investor defrauded of funds or a crime causing loss of a similarly fixed amount, but requires proper analysis of lost earnings, which is often litigated in civil cases and is typically the subject of expert testimony. *See, e.g., Shea v. Kalahari Resorts & Conventions*, No. 3:23-CV-814 (RDM), 2026 U.S. Dist. LEXIS 40386 (M.D. Pa. Feb. 27, 2026). The defense here is unable to review or challenge the officer's

requested amount nor consider the impact of any applicable disability insurance, workman's compensation, and any other financial recompense to which the affected officer might be entitled. Under the circumstances of this case, the officer's request does not provide a proper basis for consideration and possible challenge - - even if the exercise were not academic given the duration and nature of Mr. Bahnasawy's continuing custody. Under these circumstances, restitution should be waived or otherwise not imposed.

*D. Conclusion*

Mr. Bahnasawy's parents "respectfully ask for mercy in determining [Mr. Bahnasawy's] sentence and for careful consideration of his documented illness and the medical evidence concerning his condition at the time of the incident." They ask that the Court "take into account his need for proper psychiatric care, appropriate medication, addiction treatment, education, and regular family contact, along with conditions of confinement that meet his medical needs and account for the effects of isolation on his mental health." Exhibit B.

Dated: October 15, 2026

Respectfully submitted,

*/s/ Andrew J. Frisch*
Andrew J. Frisch