**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **4:21-CR-00234** |
| **v.** | : | |
| | : | **(Chief Judge Brann)** |
| | : | |
| **ABDULRAHMAN EL BAHNASAWY,** | : | **(Filed via ECF)** |
| **Defendant.** | : | |

**SENTENCING MEMORANDUM OF THE UNITED STATES**

The United States seeks a sentence of 130 years for the offenses committed by the Defendant. Given the horrific nature of Abdulrahman El Bahnasawy's attack and his enduring allegiance to ISIS, the only sentence that is sufficient but not greater than necessary is the maximum sentence on each count. Even a sentence of 130 years does not reach the otherwise applicable advisory guideline range of life imprisonment. It is only by imposing the maximum sentence allowable that this Court can fulfill the sentencing objectives required under the law. Despite already serving a 40-year sentence for plotting a terrorist attack, Bahnasawy remained undeterred and was able to plan and execute a terrorist attack in a maximum-security prison that left one corrections officer blinded in one eye for life and injured another. Only

the maximum sentence allowable under the law will provide just punishment and protect the community.

# I. BACKGROUND

## A. Factual Summary

At approximately 6:10 a.m. on December 7, 2020, USP Allenwood Corrections Officer Dale Franquet unlocked Abdulrahman El Bahnasawy's ("Bahnasawy") cell door and was brutally attacked. Bahnasawy rushed out of his cell, shouted "Allah[u] Akbar" and stabbed Officer Franquet in the neck with a shank that Bahnasawy had carved out of steel furniture in his cell. After pushing Bahnasawy away, Bahnasawy attacked Officer Franquet again, striking him in the right eye with the shank. Officer Franquet ultimately lost his right eye from the attack. After multiple surgeries, the eye was replaced with a prosthetic eye. Bahnasawy's stabbing of Officer Franquet's eye was so deep that it caused a traumatic injury to Officer Franquet's brain and lasting neurological damage for which he continues to take medication.

Corrections Officer Sara Harvey and others responded to the attack by Bahnasawy. Officer Harvey ran up the stairs to the second-floor tier where Officer Franquet was being attacked. Upon arriving at

the top of the stairs, Bahnasawy turned to face Officer Harvey and swung his weapon at her. Officer Harvey was holding a can of oleoresin capsicum pepper spray. Bahnasawy's attack was so forceful that it not only punctured Officer Harvey's right ring finger but also punctured the can of pepper spray. Officer Harvey later received stitches to treat her wound. Bahnasawy ran in the opposite direction down the tier of cells to escape the cloud of pepper spray that was released from the punctured can.

During the time it took Bahnasawy to run around the top of the second-floor tier and down the staircase on the opposite side, other officers and BOP staff responded to the duress alarm. When he came down the stairs, Bahnasawy again took a fighting stance and continued to brandish his weapon. Seven officers advanced on Bahnasawy and brought him under control, and it was not until they had done so that Bahnasawy released his grip on his weapon.

Bahnasawy was then placed in a secure cell. A second weapon was recovered from Bahnasawy's jacket pocket. This weapon was a pen with one end flattened and which held part of a razor blade. A note was

recovered from Bahnasawy's sock that read "This is a terrorist attack for the Islamic State."

The cell from which Bahnasawy launched his attack was searched. Bahnasawy was the sole occupant of this cell. Officers observed a section of a steel desk in the cell had been cut out that matched the shape of the weapon used to attack Officers Franquet and Harvey. The plastic mattress cover in the cell had multiple punctures through it. Additionally, a note was found taped inside Bahnasawy's locker written partially in English and partially in Arabic. The note was translated and states: "This is a terrorist attack for ISIS. I am one of their soldiers. I pledge allegiance to the Commander of the believers and the caliph of the Muslims, Abu Ibrahim al-Hashimi al-Qurashi, to listen and obey in good and bad, in hardship and ease – and that I will not dispute the matter with the people in authority – unless I witness a clear disbelief with evidence provided to us by Allah (God), and Allah is the witness of my statement." An illustration of the ISIS flag was included at the end of the note.

## Defendant's Prior Terrorism Conviction in SDNY

The Defendant was previously sentenced on December 19, 2018, in the Southern District of New York to 40 years in prison on the following charges: Conspiracy to Use Weapons of Mass Destruction; Conspiracy to Commit Acts of Terrorism Transcending National Boundaries; Conspiracy to Bomb a Place of Public Use and Public Transportation System; Conspiracy to Provide Material Support and Resources to Terrorists; Providing Material Support and Resources to Terrorists; Conspiracy to Provide Material Support and Resources to a Designated Foreign Terrorist Organization; and Providing Material Support and Resources to a Designated Foreign Terrorist Organization.

At that time, Defendant was a Canadian citizen who pledged his allegiance to ISIS, worked online to support ISIS's recruitment and attack planning efforts, plotted with fellow ISIS supporters to carry out mass-casualty terrorist bombings and shootings in New York City, acquired chemicals and other bomb-making components for carrying out the attack, and traveled from Canada to the New York City area for the purpose of executing the attack. Law enforcement thwarted the plot, preventing the Defendant from killing and maiming innocent men,

women, and children going about their daily lives in New York City. While incarcerated, months after his arrest, and prior to his sentencing, the Defendant marked the walls of his prison cell with images and statements expressing his support for ISIS and terrorist attacks, and warning that more attacks were to come.

The Defendant was transferred to United States Penitentiary Allenwood on or about November 2, 2020. He conducted the instant violent terrorist attack slightly more than one month later.

## B. Procedural History

The procedural history of this case is well-known to the Court. The immediate history of this case leading to the present sentencing begins in October 2025. The matter was scheduled for trial to commence on November 17, 2025. At the end of October 2025, Bahnasawy indicated that he wished to enter a guilty plea to the indictment. He moved the Court to allow his guilty plea to occur via videoconference from the United States Penitentiary in Florence, Colorado. Doc. 133. Bahnasawy further indicated that although he would plead to Counts 1 through 8 (related to the assault on corrections officers and weapons possession charges), he wished to enter a

conditional plea to Count 9 (Providing and Attempting to Provide Material Support to a Designated Foreign Terrorist Organization), because he did not believe that the factual predicate that the government would establish met the legal requirements of the crime alleged in Count 9. With the consent of the Court and the government, Bahnasawy was permitted to plead conditionally to Count 9. On November 4, 2025, Bahnasawy's guilty pleas were entered. Doc. 142, 143.

On November 18, 2025, the Defendant moved to dismiss Count 9. Doc. 149, 150. The government opposed Bahnasawy's motion. Doc. 152. On January 21, 2026, the Court denied Bahnasawy's motion and held that a sufficient factual basis existed for Bahnasawy's guilty plea to this count. Doc. 155, 156.

On April 29, 2026, the Defendant filed a motion for reconsideration based on the 2nd Circuit's decision in *United States v. Ullah*, 21-1058 (2nd Cir. April 21, 2026). Doc. 161, 162. The government opposed Bahnasawy's motion. Doc. 167. On August 13, 2026, the Court denied Bahnasawy's motion for reconsideration. Doc. 169.

A Pre-Sentence Report was prepared on August 24, 2026. Doc. 170. The Probation Officer calculated Bahnasawy's advisory guideline range to be Life imprisonment based on an offense level of 55 (capped at 43) and a criminal history category of VI. PSR Par. 86. Because the statutory maximum for each count is less than the otherwise-applicable guideline range, the final advisory guideline range for each count is the statutory maximum, that is, 20 years each for Counts 1-4; 10 years each for Counts 5 and 6; 5 years each for Count 7 and 8; and 20 years for Count 9. PSR Par. 86.

Sentencing in this matter is scheduled for October 19, 2026. Doc. 173.

## A. SENTENCING FACTORS UNDER TITLE 18, UNITED STATES CODE, § 3553(a).

After determining the kinds of sentence and the guideline range, the Court must consider other applicable factors in 18 U.S.C. Section 3553(a) to determine a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

Although a district court need not address each of the §3553(a) factors at length, "[t]he sentencing judge should set forth enough to satisfy the appellate court that she has considered the parties'

arguments and has a reasoned basis for exercising his own legal decision-making authority." *Rita v. United States*, 127 S. Ct. 2456, 2468 (2007); *Gall v. United States*, 128 S. Ct. 586, 597 (2007) (explaining that the sentencing court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing").

The final step in the sentencing process is the balancing of the Section 3553(a) factors. These factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed -
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established ...
>
> (5) any pertinent policy statement ...

> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. §3553(a).

During this stage of the sentencing proceeding, the district court is required to not only balance these factors but to create a sufficient record for an appeals court to have confidence that it has considered these factors. *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009). While the record does not have to address every possible argument, "a colorable argument about the applicability of one of the §3553(a) factors" should be addressed. *United States v. Merced*, 603 F.3d 203, 215 (3d Cir. 2010).

**1. The nature and circumstances of the offense.**

Few federal crimes are as horrific as the intentional maiming of another person by stabbing them in the eye and leaving them blinded for life. The Defendant conducted this violent attack in the name of ISIS, a designated foreign terrorist organization. In fact, he wrote two separate notes declaring that he was conducting a "terrorist attack" for ISIS. Because of the attack by the Defendant, Dale Franquet lost his

sight in his right eye, lost his career as a corrections officer, and will require neurological treatment for the rest of his life. Although a corrections officer should expect a certain degree of physicality in his job and may even expect to have to engage with aggressive inmates, no corrections officer should expect to have to defend himself from a knife-wielding inmate stabbing him in the face in the name of ISIS.

The Defendant's premeditated actions for this violent terrorist attack included fashioning not one, but two weapons for use in the attack and also writing notes stating that this was a "terrorist attack" for ISIS that would later be found both in the sock he was wearing and also taped inside the locker in his cell. Furthermore, this attack cannot be viewed in isolation, it is a direct continuation of the Defendant's obsession with ISIS which started in or about 2015 and led to his initial conviction in SDNY for which he received a 40-year prison sentence for terrorism offenses related to his plot to conduct mass-casualty attacks in New York City.

**2. The history and characteristics of the defendant**

The Defendant is a recidivist terrorist. At the time of his attack on Officers Franquet and Harvey, he was already serving a significant

prison sentence for his role in a thwarted attack involving the detonation of an explosive device in New York City. The attack at USP Allenwood on December 7, 2020, shows that Bahnasawy remains a terrorist, that he remains strongly motivated by ISIS ideology, and that he remains willing and able to carry out terrorist attacks on behalf of ISIS, even when in a high-security prison. Despite already serving a 40-year sentence for terrorism offenses, prior to committing this violent attack inside the prison the Defendant pledged his allegiance to the leader of ISIS in a note found taped in his locker and stated in that same note "This is a terrorist attack for ISIS. I am one of their soldiers." This conclusively demonstrates the Defendant's unwavering allegiance to ISIS and his ongoing commitment to conduct attacks in their name. In fact, several months after this attack he was found to have carved "ISIS" in two locations in his prison cell. This is consistent with his actions in New York while awaiting sentencing when he marked the walls of his prison cell with images and statements expressing his support for ISIS and terrorist attacks and warned that more attacks were to come.

In the Pre-Sentence Report, the Probation Office includes excerpts from a psychiatric report prepared by Dr. Kenneth Weiss, M.D., (Par. 3), and a competency evaluation performed by Dr. Ronald Schouten, (Par. 4, 5, 69). These psychological/psychiatric evaluations have virtually no relevance to the sentencing analysis that must be performed by this Court.

The report prepared by Dr. Weiss was conducted at the behest of Bahnasawy's legal team to prepare a defense for trial. The United States does not agree with or endorse the medical or legal opinions of Dr. Weiss and objects to their inclusion in the Pre-Sentence Report.[1] Dr. Weiss's opinion that Bahnasawy's attack was "animated by a mental disease" and that he was "controlled by a hallucination" are merely his opinion. Had this matter proceeded to trial, the United States would have presented its own expert to counter Dr. Weiss. However, by his guilty plea – in which he admitted his guilty conduct – Bahnasawy made the resolution of this issue moot. Any reference to being controlled by a hallucination is not only not relevant but also

[1] The United States lodged an objection on these grounds with the Probation Office on April 8, 2026.

misleading and undermines the voluntariness of Bahnasawy's plea. Paragraph 3 should be stricken from the PSR because it is not a relevant characteristic of Bahnasawy.

For similar reasons, Paragraphs 4, 5, and 69, related to Bahnasawy's competency to stand trial, should also be stricken from the PSR.[2] Competency to stand trial is an issue that is distinct from any mental health defense. The overwhelming majority of criminal defendants are competent to understand the proceedings and assist their attorney, that is, competent to stand trial. Here, based on Bahnasawy's mental health history, the government moved in an abundance of caution for a competency evaluation. The evaluation was done, and Bahnasawy was without question found competent to stand trial. There is no reason that just because a competency evaluation was done that there is an ongoing need for this issue to continue to inform the Court as it imposes sentence. As will be discussed further, the Court *should* consider the need to provide psychological care to

[2] The United States lodged an objection on these grounds with the Probation Office on April 8, 2026.

Bahnasawy in the most effective manner,[3] but a prior evaluation on the specific legal issue of competency is of no value to the Court in evaluating Bahnasawy's present history, characteristics and psychological needs.

**3. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.**

Few offenses are more serious than conducting a violent terrorist attack resulting in the maiming of a fellow human being by stabbing him in the eye. The context around Bahnasawy's December 2020 attack makes this already-serious offense even more so. That is, not only did Bahnasawy maim Dale Franquet, but he did so with a weapon. And not only did he do so with a weapon, but with a weapon that he himself made for the purpose of conducting a terrorist attack. Nor was it a weapon that was simply one of convenience that was made on an impulse, but rather was one painstakingly fashioned from a steel desk frame. The Defendant also had a second weapon with him at the time of the attack and prepared notes in advance of the attack, one in his

[3] 18 U.S.C. 3553(a)(2)(D)

sock and one in his locker, clearly explaining that his attack was conducted on behalf of ISIS. The attack was clearly premeditated and planned. And Bahnasawy did not limit his attack only to Officer Franquet. As Corrections Officer Sara Harvey came to Officer Franquet's aid, Bahnasawy turned to face her, and began a deliberate attack on her. Bahnasawy's attack on Officer Harvey was so vicious that his errant blow punctured a steel pepper spray canister and pierced her finger, a wound later requiring stitches. Although the cloud of pepper spray caused Bahasawy to flee the area and ended the immediate attack, Bahnasawy continued to stay armed and take an aggressive posture until he was overwhelmed by multiple other corrections officers. By any measure, this is a serious offense deserving of serious punishment, a conclusion underscored by Bahnasawy's apparent lack of respect for the law, given that this offense occurred while he was already serving a lengthy sentence for his conviction on multiple terrorism offenses.

There is no question that the Defendant warrants a significant prison sentence when looking solely at the facts and circumstances of this attack. However, this case requires full review of the Defendant's

longstanding efforts to conduct violent attacks on behalf of ISIS, behavior dating back to approximately 2015. To determine a sentence which reflects the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, Bahnasawy's unwavering commitment to conduct violent attacks on behalf of ISIS must be considered in its entirety. The full review of the Defendant's actions and behavior dating back to 2015 warrants the maximum sentence available.

**4. The need to afford adequate deterrence and to protect the public from further crimes of the defendant.**

That Bahnasawy committed this violent attack on behalf of ISIS while already serving a lengthy sentence for serious terrorism offenses clearly shows that he has been undeterred from criminal conduct and remains a threat to prison staff and his fellow inmates. Despite having his liberty taken away for conspiring to conduct a terrorist attack in New York City, Bahnasawy continued his allegiance to ISIS and continued to plan and execute a terrorist attack using the means he had available, with grave results. Moreover, his disciplinary history while incarcerated shows that he is also not deterred from ongoing misconduct. He has incurred multiple infractions during his time of

incarceration, many of which involve assault and the possession of weapons, as detailed below.

Additionally, Bahnasawy's behavior in prison both before and, more tellingly, after, the December 7, 2020, attack, show that he remains committed to a terrorist ideology and is undeterred in his efforts to commit violence on behalf of ISIS. While in BOP custody, Bahnasawy has simply never wavered from his allegiance to ISIS, his desire to inflict harm in the name of ISIS, his attempts to recruit others, and his attempts to arm himself with weapons. Most notably:

**2016, MCC New York**: After his arrest in May 2016, Bahnasawy marked his cell walls at MCC New York with images and statements expressing support for ISIS and admitted that he had engaged in conversations with other inmates and expressed support for a terrorist attack on MCC New York and local law enforcement. See Exhibit A.

**2020, USP Big Sandy**: In July 2020, several months before the attack at USP Allenwood, Bahnasawy's cell (that he shared with another inmate) was searched. During the search, an officer

discovered the outline of a weapon being carved into the bed frame. See Exhibit B.

<u>2021, USP Lewisburg</u>: After the attack on Officers Franquet and Harvey, Bahnasawy was moved from USP Allenwood to USP Lewisburg. During a search of his cell (occupied solely by Bahnasawy) on February 20, 2021, an officer found two carvings, one above the door and one above the window, that both read "ISIS." See Exhibit C.

<u>2022, ADX Florence</u>: Nearly two years after the attack on Officers Franquet and Harvey, Bahnasawy attempted to recruit another inmate so that "one day we can be brothers fighting the Tyrants together for the Islamic State (ISIS)." He also shared "some pics of the C.O. I stabbed, Enjoy!" Bahnasawy also indicated his desire to attack a female guard and sought advice on how to stab a guard around their vest. See Exhibit D.

Upon becoming aware of this threat, Bahnasawy's cell (of which he was the sole occupant) was searched. The search showed

that a piece of metal was cut out of Bahnasawy's bunk in the shape of a weapon. No weapon was recovered, although prison staff located a hole in the wall where it could have been dropped. See Exhibit E.

2024, ADX Florence: On July 20, 2024, nearly 4 years after the attack on Officers Franquet and Harvey, officers located an 8-inch homemade weapon outside of Bahnasawy's cell at ADX Florence. A review of video footage showed the weapon came from underneath the door of a cell that was occupied solely by Bahnasawy. See Exhibit F.

These repeated and ongoing incidents show Bahnasawy's unwavering commitment to ISIS and are evidence of his continued desire to harm others. He is undeterred and represents a grave risk to the community if not kept incarcerated as requested by the government.

**5. The need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

Although the United States believes that the psychiatric evaluations conducted during the litigation of the instant case (PSR Par. 3, 4, 5, and 69) have no bearing on this Court's analysis of the appropriate sentence, it is apparent from Bahnasawy's medical history that he may be in need of ongoing mental health treatment. Whatever claims Bahnasawy makes that the Bureau of Prisons is unable to provide effective treatment are undermined by the fact that Bahnasawy himself has not always availed himself of the treatment that is offered. For example, prior to Bahnasawy's transfer to USP Allenwood he was housed at USP Big Sandy. His medical records show that while at Big Sandy, Bahnasawy discontinued his prescribed antipsychotic medication in January 2020 because he complained of the side effects. (Exhibit G). Upon his admission to Allenwood, records indicate that Bahnasawy denied experiencing any mental health symptoms. (Exhibit H). The Bureau of Prisons can provide treatment, but it can only go so far -- it cannot force someone to take medication, much less someone who does not want it and is not expressing symptoms. Although

Bahnasawy's overall history shows that he may need mental health treatment, given his proclivities towards violence and his ability to carry out such proclivities, any such treatment should occur within the setting of a secure federal penitentiary.

**6. The need to provide restitution to victims of the offense.**

Dale Franquet seeks $3,000,000 in restitution for his lost salary, loss of retirement savings, social security loss, as well as for his brain trauma, PTSD, and complete loss of his right eye. PSR Par. 101.

The Mandatory Victim Restitution Act requires the court to order full restitution to victims of specific crimes, including, as here, crimes of violence. 18 U.S.C. §3663A(c)(1)(A)(i). Dale Franquet is a victim under §3663A, that is, a "person directly and proximately harmed" as a result of the defendant's commission of an offense. §3663A(a)(2). Restitution is owed regardless of a defendant's ability to pay. *United States v. Yeager*, 331 F.3d 1216 (11th Cir. 2003); *United States v. Lino*, 327 F.3d 208 (2nd Cir. 2003) (Holding that it is better to impose restitution obligations that a defendant will be unable to meet than to let the victim go uncompensated while the defendant retains newly acquired wealth). A defendant's ability to pay should only be addressed when

setting up a payment schedule. *United States v. Stoecker*, 215 F.3d 788 (7th Cir. 2000). As an inmate, Bahnasawy will be able to make payments through the Inmate Financial Responsibility Program. *See United States v. Wilson*, 416 F.3d 1164 (10th Cir. 2005).

Restitution for Officer Franquet's lost income is appropriate. 18 U.S.C. §§ 3663(b)(2)(C), 3663A(b)(2)(C); *United States v. Messina*, 806 F.3d 55, 67-8 (2d Cir. 2015) (noting that section 3663A(b)(2)(C) requires restitution awards for the lost income of the victims of physical injuries).

Officer Franquet has provided a detailed calculation of his losses and has substantiated his calculations with paystubs that show his earnings; a spreadsheet that shows a projection of future earnings, and records from the Social Security Administration. These are reasonable estimates of his losses that may be relied upon by this Court. *United States v. McCormack*, 152 F.4th 428 (3rd Cir. 2025) citing *United States v. Fumo*, 655 F.3d 288, 310 (3d Cir. 2011) ("But when precise figures are unavailable, courts may rely on "reasonable estimate[s]."). The lost income of Officer Franquet is not comparable to the disallowed lost income in *McCormack*. In *McCormack*, the 3rd Circuit found that a

restitution award was based on impermissible double counting, that is, an award for the full retail value of stolen firearms plus an award for the lost income when the victims' store was closed during which time some of those firearms would have been sold. Here, there is no such double counting.

Furthermore, all losses claimed by Officer Franquet are directly related to the injury inflicted by Bahnasawy and cannot be classified as "consequential damages", which would be disallowed. *See, e.g., In re Chester J. Marine LLC* 2021 WL 4782961 (Bankr. E.D. La. 2021) ("Consequential damages, or special damages, are those unusual or indirect costs that, although caused by defendant's conduct in a literal sense, are beyond what one would reasonably expect to be ordinary consequences of breach of contract."), see also *Government of Virgin Islands v. Davis*, 43 F.3d 41 (3rd Cir. 1994).

Officer Franquet lost his right eye and his 24-year career as a BOP corrections officer. In addition to losing his sight in his right eye, he suffers from medical conditions that will require lifelong treatment, such as seizures that require medication and trauma to his brain. The

restitution award sought is to compensate him for these losses that are a direct (not consequential) result of the violent attack by Bahnasawy.

## B. SENTENCING RECOMMENDATION

The United States seeks a sentence of 130 years, to run consecutive to the sentence that Bahnasawy is presently serving for his prior conviction in the Southern District of New York on terrorism offenses. This sentence consists of 20 years each on Counts 1 through 4; 10 years each on Counts 5 and 6; 5 years each on Counts 7 and 8; and 20 years on Count 9. Each of these terms of imprisonment should run consecutively to each other and to the SDNY sentence. Although these terms of imprisonment are the statutory maximums, they are also consistent with the guideline sentence called for under the sentencing guidelines. Even when combined for a total sentence of 130 years, they still do not reach the applicable guideline range of life in prison.

Each of the counts of conviction represent distinct harms. There is no legal impediment to the imposition of such sentences. Assault with the intent to commit murder and assault with a deadly weapon and assault of a federal officer all involve distinct elements and protect against different harms, even if they involve the same victim. The

Court may therefore impose separate sentences on these counts. See *United States v. Scott*, No. 24-2517, 2025 WL 1905097, at *1 (3d Cir. July 10, 2025) *citing United States v. Miller*, 527 F.3d 54, 70–71 (3d Cir. 2008); *Blockburger v. United States*, 284 U.S. 299, 304 (1932) (Affirming consecutive sentences for convictions under §113(a)(1) and (a)(6) involving the same victim because, "(f)acially, the two counts are distinct offenses…each count requires proof of an element not required by the other count, making them different offenses under the *Blockburger* test.").

The provision and attempted provision of material support to ISIS also involves separate elements from the charges above.

Not only is the Court permitted to impose consecutive sentences on each count, but it should do so because it is only with such a sentence that the Court can ensure that the sentencing objectives required by §3553(a) are met. Despite being sentenced in 2018 to a lengthy term of imprisonment for his conviction for various terrorism offenses, Bahnasawy was undeterred and committed an appalling act of violence in the name of ISIS just a few years later. That he did so while in a high security federal prison shows that his devotion to a terrorist

ideology knows no bounds. Far from showing even the slightest bit of remorse for his terrorist plans in New York, or for his victims at USP Allenwood, this Defendant has only fixated on conducting violent terrorist attacks in the name of ISIS, and has repeatedly continued his efforts while in prison to make weapons for use in such attacks. Only by sentencing this Defendant to a maximum consecutive term of imprisonment can this Court ensure that the community is protected.

Respectfully submitted,

BRIAN D. MILLER
United States Attorney

Date: October 15, 2026

s/Geoffrey W. MacArthur
GEOFFREY W. MacARTHUR
Assistant United States Attorney
United States Attorney's Office
240 West Third Street, Suite 316
Williamsport, PA 17701
Email: Geoffrey.macarthur@usdoj.gov

LARRY SCHNEIDER
Deputy Chief
Counterterrorism Section
U.S. Department of Justice
950 Pennsylvania Ave, NW
Room 7600
Washington, DC 20530

202-616-4940
Email: Larry.Schneider@usdoj.gov

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | 4:21-CR-00234 |
| v. | : | |
| | : | |
| ABDULRAHMAN EL BAHNASAWY, | : | (Chief Judge Brann) |
| Defendant. | : | |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this Thursday, October 15, 2026, he served a true and correct copy of the foregoing

**SENTENCING MEMORANDUM OF THE UNITED STATES**

by ECF to:

Andrew J. Frisch,Esq.

s/Geoffrey W. MacArthur
GEOFFREY W. MacARTHUR
Assistant United States Attorney